UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ONLINE PUBLICATION ONLY

WENDELL M. LIGON,

                                    Plaintiff,

        - versus -

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                                    Defendant.

MEMORANDUM
AND ORDER
11-CV-0162 (JG)

A P P E A R A N C ES:

        HERBERT S. FORSMITH
                26 Broadway, 17th Floor
                New York, NY 10004
                *Attorney for Plaintiff*

        LORETTA E. LYNCH
                United States Attorney
                Eastern District of New York
                271 Cadman Plaza East
                Brooklyn, NY 11201
        By:    Candace Scott Appleton
                *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

        The Commissioner of Social Security, Michael Astrue, has now twice denied

Wendell M. Ligon Supplemental Security Insurance ("SSI") benefits under Title XVI of the

Social Security Act ("the Act").  In 2008, Ligon appeared in my court after his first denial of

benefits, and I remanded the case for a new hearing.  *See Ligon v. Astrue*, No. 08-CV-1551 (JG)

(MDG), 2008 WL 5378374 (E.D.N.Y. Dec. 23, 2008).  On remand, the Commissioner again

denied Ligon disability benefits.  Ligon again seeks review of the Commissioner's decision

under 42 U.S.C. § 405(g).  For the reasons that follow, I reverse the Commissioner's decision and remand for the calculation of benefits.

BACKGROUND

The facts were recounted in full in my prior opinion in this case.  *See Ligon*, 2008 WL 5378374, at *1-*7.  I will summarize them again here for the reader's benefit, updating them where appropriate in light of developments since my 2008 opinion.

Ligon is a 53-year-old man, who was born in Tuskegee, Alabama on February 2, 1959.  He is 6'1" and weighs 215 pounds.  Ligon attended school through the ninth grade and then enrolled in woodworking vocational school.  He never obtained his GED.  He seeks a determination of disability based on injuries he sustained to his back and left knee as a result of being hit by a car on or about October 28, 2003.

A.    *Work History*

Prior to his injury in 2003, Ligon worked consistently for over 20 years.  For a period of about seven years beginning in approximately 1981, he worked security at LaGuardia Airport, checking people's luggage and frequently lifting 70 to 80 pounds.  R. 607.  For the next six years, from 1988 to 1994, he worked as a car transporter for car dealerships; his job responsibilities consisted primarily of driving vehicles between dealerships.  R. 607, 86.  He worked full time and made approximately $10 per hour.  R. 86.  From 1994 to 1998, Ligon worked as a parking coordinator for the television production, "Law and Order."  R. 82, 606.  He coordinated the parking and security of the camera and crew trucks and assisted in carrying equipment and changing sets, requiring him to lift up to 100 pounds.  R. 85, 606.  The job demanded 12-hour days, five days a week, for which he was paid $1,250 per week.  R. 85, 606, 608.  From 1999 until his 2003 injury, Ligon worked full-time doing maintenance and janitorial

2

work in office buildings.  R. 82-83.  His responsibilities included stripping, washing, and buffing floors, dumping garbage, cleaning bathrooms, and transporting supplies, desks, and tables.  R. 605.  He walked, stooped, bent, and lifted up to 100 pounds on a daily basis.  R. 83, 605.

Around 1998, while working as a parking coordinator for "Law and Order," Ligon injured his neck and back when he was hit by a golf cart.  R. 610-11.  He was diagnosed with a cervical spine injury for which he underwent a course of physical therapy.  R. 177.  He returned to work six or seven months after the incident, R. 610-11, and his symptoms predominantly resolved after approximately two years.  R. 177.  Ligon never sought any form of disability benefits as a result of that injury.  R. 610-11, 177.

B.     *Ligon's Relevant Injury and Course of Medical Treatment*

On or about October 28, 2003,[1] while taking out the garbage as part of his job as a maintenance worker, Ligon was bending over a three-foot-high garbage dumpster in the parking lot when a car struck him and the dumpster.  R. 176.  The impact caused the dumpster to strike the right side of his face, knocking Ligon onto the pavement on his left side.  *Id.*  As a result, he lost a tooth and sustained injuries to his back and left knee.  *Id.*  Ligon was taken in an ambulance to the emergency room where he received x-rays and treatment.  R. 177, 132.

A few days later, on November 6, 2003, Ligon was seen by Dr. Neil Morgenstern, M.D., a physiatrist, complaining of persistent pain from the incident.  R. 132.  His chief complaint was lower back pain which intermittently radiated into his left leg accompanied by numbness in his left leg.  *Id.*  Ligon explained that the pain was exacerbated by standing, ambulating, and bending, and said he had not returned to work since the incident.  *Id.* Morgenstern thoroughly examined Ligon and concluded that "[t]he patient is currently disabled

---

[1]      The date is variously reported in the record as October 26, 27, and 28, 2003.

from his regular job duties." R. 133. He prescribed a course of physical therapy, x-rays, MRIs, and "immediate[]" orthopedic consultation. *Id.* Ligon began physical therapy, and continued to see Morgenstern regularly.

Morgenstern referred Ligon to Dr. Dov Berkowitz, an orthopedic surgeon, who examined Ligon in December 2003. R. 110. Berkowitz reported that Ligon was experiencing "significant pain," spasms, and tenderness in his lumbar spine. *Id.* In addition, this back pain was radiating into his left leg, making flexion of the knee "markedly painful." *Id.* Berkowitz ordered immediate MRIs of Ligon's lumbar spine and left knee. R. 110, 177.

In February 2004, Dr. Harold Avella, M.D., another doctor in Morgenstern's office, conducted a follow-up examination of Ligon. He found that Ligon was "still having a lot of back pain which is present all of the time and exacerbated by any activity especially with bending or lifting. It radiates into the left leg down to the knee and there is numbness of the leg as well. There is also left knee pain which is increased by any weight bearing. There is occasional sharp shooting pain. He is using a cane at all times." R. 146. After an examination, he assessed Ligon with lumbar herniated discs and left knee internal derangement. R. 147.

In April 2004, Morgenstern reported that an MRI of Ligon's lumbar spine (taken in January 2004) had revealed an L2/3 and L5/S1 disc bulge, and an L3/4 and L4/5 disc herniation. R. 144. He diagnosed Ligon with lumbar spine disc bulge, lumbar spine disc herniation, and knee sprain. R. 145. However, the state workers' compensation board denied Berkowitz's repeated authorization requests for MRIs of Ligon's knee. By April 2004, after conducting another examination of Ligon and finding that left knee flexion was "still very painful," Berkowitz concluded his report, saying, "At this point I am once again requesting AUTHORIZATION from compensation for an MRI to the left knee. The patient is now already

6 months since the time of his injury with persistent pain and I certainly believe it is time to get an MRI test." R. 109. In May 2004, Berkowitz and Morgenstern were still waiting for this authorization. R. 143.

In connection with Ligon's workers' compensation claim, Dr. Jonathan Glassman, a doctor from the New York State Insurance Fund, performed an independent medical evaluation of Ligon on April 28, 2004. R. 339-41. Glassman diagnosed Ligon with a "[r]esolving sprain of the lumbar spine with left sided radicular complaint," a "[r]esolved contusion left leg," and "[i]nternal derangement left knee." R. 341. He determined that "[a]rthroscopy of the left knee is reasonable." *Id*. Although he had not reviewed Ligon's medical records, he opined that Ligon had a "mild disability" and could return to light clerical[2] or sedentary work.[3] *Id*. On June 30, 2004, Ligon visited Glassman for a second evaluation. R. 333-36. Glassman concluded that there was no need for any further physical therapy, although an MRI of the left knee was reasonable. R. 335. He opined that there was no need for surgery, and that Ligon had a "mild" disability and could work so long as he was not made to lift or carry more than 30 pounds. *Id*. He agreed that "[i]t is apparent that the injuries sustained and the accident reported are causally related." R. 336.

---

[2]     According to SSA regulations: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

[3]     According to SSA regulations: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." *Id*. "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday." S.S.R. 96-9P, 1996 WL 374185, at *3.

The workers' compensation board eventually authorized an MRI of Ligon's left knee. After reviewing the MRI results, Berkowitz diagnosed Ligon with internal derangement of his left knee. R. 152. Berkowitz requested and received authorization to perform an arthroscopic meniscectomy on Ligon's left knee, and on August 20, 2004, he performed the operation. R. 152, 177. Berkowitz's post-operative diagnosis was hypertrophic synovitis and debris of the patellofemoral joint. R. 152. Ligon continued to follow up with Berkowitz and Morgenstern after the surgery. Ligon also continued regular physiatric visits with Dr. Gautam Khakhar, M.D., approximately once per month until approximately November 2005. R. 177, 259-62. Morgenstern and Khakhar consistently concluded throughout 2004 and 2005 that Ligon was partially disabled as a result of his back and knee injury. *See* R. 155-58, 259-68, 272-79, 315-20, 331-32, 342-43, 346-49, 352-53.

On August 26, 2005, at the request of the state workers' compensation board, Dr. Robert Zaretsky, an orthopedic surgeon, conducted an "independent medical examination" of Ligon. R. 326-28. Zaretsky recorded that Ligon reported pain when standing, walking, bending

Glassman, the state insurance doctor, evaluated Ligon a third time on May 11, 2005. R. 311-14. Ligon complained to Glassman of lower back pain, which occasionally radiated to his left knee, and difficulty walking. R. 312. He stated that he required a cane to walk more than five blocks and could no longer lift up his godson, who weighed 30 pounds. *Id.* After examining Ligon, Glassman reported that there was "no indication for further treatment from an orthopedic viewpoint." R. 313. He also wrote that there was "no need for further physical therapy," and that he was "at a loss" to understand the need for the hinged knee brace. *Id.* He concluded that Ligon had a "mild disability," though he added that "[t]here is objective evidence of a need to limit work status and/or activities of daily living." *Id*.

On August 26, 2005, at the request of the state workers' compensation board, Dr. Robert Zaretsky, an orthopedic surgeon, conducted an "independent medical examination" of Ligon. R. 326-28. Zaretsky recorded that Ligon reported pain when standing, walking, bending

and lifting and that treatment had not improved his condition. R. 326. After conducting a series of tests and reviewing Ligon's medical evaluations and reports, Zaretsky diagnosed Ligon with resolved herniated lumbar discs and post arthroscopic surgery of the left knee, synovectomy. R. 327. He noted a schedule loss of use of the left lower extremity of five percent and concluded that further treatment was "not reasonable, related or necessary." *Id*. After reviewing additional medical records, Zaretsky submitted an addendum to his report on October 12, 2005, noting that his opinion of Ligon's condition was unchanged. R. 323-24.

However, Ligon's symptoms persisted and worsened, and he ultimately sought treatment in March 2006 from Dr. Gideon Hedrych, M.D., an emergency medicine and trauma specialist. R. 176. After conducting a comprehensive initial examination, Hedrych observed that Ligon's gait was markedly antalgic favoring his left side, and Ligon's heel and toe ambulation were markedly limited due to left lower extremity radicular pain. R. 305-07. Hedrych concluded that Ligon's disability was "total." R. 305.

Hedrych referred Ligon to Dr. Ofra Blonder, a Physical Medicine and Rehabilitation Specialist, for a consultative examination, which was performed in April 2006. R. 301-03. Observing that Ligon's left knee demonstrated tenderness and pain on flexion, his gait was slow and slightly antalgic favoring the left leg, and his lumbar spine revealed limitation of motion in all planes, tenderness, and spasm, Blonder concluded that Ligon's disability was "[t]otal." R. 302.

In July 2006, around the time that Ligon applied for SSI benefits, Hedrych submitted a comprehensive report to the New York State Division of Disability Determinations. He reported that Ligon was unable to sit or stand for more than 45 minutes or walk for more than 8 blocks without experiencing lower back pain radiating into his left leg. R. 179-80. He could

not lift, carry, push, or pull any significant weight, and could not bend, stoop, or crouch. R. 180.

Hedrych thus concluded that Ligon was "totally disabled," and "unable to do any job currently

available to him in the market place." *Id*. Hedrych continued to see Ligon frequently throughout

2006. On each occasion, Hedrych diagnosed Ligon with a "total" disability. *See* R. 305

(3/6/06), 309 (3/22/06), 299 (4/12/06), 302 (4/20/06), 296 (6/21/06), 293 (8/23/06), 290

(10/4/06), 287 (12/18/06).

On July 31, 2006, at the request of the state Division of Disability, Dr. Marilee

Mescon preformed a consultative internal medicine examination on Ligon.[4] R. 182-86. Mescon

recorded that Ligon complained of pain in his back that radiates down to his left knee, sometimes

with tingling in the left leg. R. 182. She recorded that Ligon said he can sit intermittently for 2

hours and stand for about 45 minutes, and that he gets partial pain relief from medication and

changing positions. *Id*. Mescon recorded that Ligon could shower, dress and bathe by himself,

but that "[s]omeone else does the shopping, cooking, and cleaning." R. 183. Mescon concluded

in the final paragraph of her report, titled "Medical Source Statement," that there were "no

objective findings to support the fact that [Ligon] would be restricted in his capacity to sit or

stand for short periods of time,[5] but his capacity to climb, push, pull, or carry heavy objects

would probably be mildly to moderately restricted by back and knee pain." R. 185.

On November 19, 2007, Hedrych completed a "Medical Source Statement of

Ability To Do Work-Related Activities (Physical)," (hereinafter "RFC Assessment"), a standard

---

[4]     The ALJ wrote in his opinion that Mescon performed the exam "at the request of
the Division of Disability." R. 511. SSA regulations permit the agency to require a consultative
exam when the claimant's "medical sources cannot or will not give [the agency] sufficient
medical evidence about [the claimant's] impairment for [the agency] to determine whether [the
claimant is] disabled." 20 C.F.R. § 404.1517. Mescon noted that no doctor-patient relationship
existed or was implied by the examination. R. 186.

[5]     At oral argument, the government stated that "short periods of time" in this
context is generally understood to mean two hours and less. Tr. at 6.

form prepared by the Social Security Administration. R. 414-23. In the RFC Assessment, Hedrych reported that, in an eight-hour workday, Ligon could sit for a total of 1-2 hours (in 10-15 minute intervals); stand for a total of 1-2 hours (in 10-15 minute intervals); and walk for up to a total of 2 hours (in 15 minute intervals). R. 415. He reported that Ligon could never climb stairs, ramps, or ladders, stoop, kneel, crouch, or crawl. R. 417. Hedrych further reported the Ligon could lift and carry up to 5 pounds infrequently, and could occasionally use his hands for reaching, handling, pushing, or pulling, R. 414, 416, but could never operate foot controls. R. 416. The medical findings supporting his assessment were Ligon's left knee derangement with possible torn meniscus and lumbrosacral derangement with lumbar radiculopathy and spasm spine sprain-strain. R. 414.

On June 6, 2009, after I remanded his case, Ligon visited Dr. Yinggang Zheng for a consultative orthopedic examination. R. 580-83.[6] Zheng reported that Ligon complained of low back pain that radiated to his left thigh and caused numbness and tingling. R. 580. Ligon said his pain was aggravated by walking and movement, and could be partially relieved by rest and by taking medication, including etodolac, acetaminophen with codeine, Aleve, and aspirin. *Id*. Ligon was attending physical therapy and could walk two blocks with a cane. *Id*. Ligon stated that he lived with his brother, and cooked three times a week. R. 580-81. Zheng reported that Ligon could shower and dress himself, but he "does not do cleaning, laundry, shopping because of the pain." R. 581. Most days, he watches TV, listens to the radio, and reads. *Id*.

Zheng observed that Ligon used a cane, and could not walk on his heels or toes, but otherwise had a normal gait. R. 581. Zheng believed Ligon's cane was necessary, based on Ligon's constant use of it. *Id.* Ligon could not squat because of his left knee pain. *Id.* Ligon

---

[6]      Zheng noted that no doctor-patient relationship existed or was implied by the examination. R. 582.

had no trouble getting dressed or getting on and off the examining table. *Id.* Zheng diagnosed Ligon with "low back pain possibly discogenic back disease" and "left knee pain possibly degenerative arthritis." R. 582. In his concluding paragraph labeled "Medical Source Statement," Zheng concluded that Ligon was "moderately limited for walking, standing, climbing, lifting, squatting, and bending. No limitation with upper extremity for fine and gross motor activity." *Id.*

On June 13, 2009, Zheng completed an official SSA "Medical Source Statement of Ability To Do Work-Related Activities (Physical)" (again, I will refer to this form as an "RFC Assessment"). R. 584-89. Zheng indicated that out of an eight-hour workday, Ligon could sit for a total of three hours (in intervals of 30 minutes), and stand and walk for a total of two hours (also in intervals of 30 minutes). R. 584-85. Zheng indicated that Ligon used a cane to ambulate, which was medically necessary, and that Ligon could walk up to two blocks without the cane. R. 585. In Zheng's opinion, Ligon could "never" lift or carry 10 pounds. R. 584. However, Ligon was not otherwise limited in the use of his hands, and he could use them for activities frequently. R. 586. Zheng opined that Ligon could use his foot occasionally. *Id.* In Zheng's opinion, Ligon could perform postural activities such as climbing stairs, stooping, kneeling, and crouching "occasionally." R. 587. Zheng found that these limitations had been present since 2004, and the limitations had lasted for at least 12 consecutive months. R. 589.[7]

---

[7] The record also includes medical records from medical professionals who are not doctors. One physical therapist, Lea Navallasca, performed an initial range of motion evaluation for Ligon on November 11, 2003. R. 213-18. Another physical therapist, Marife Alfonso-Gutierrez, performed a re-evaluation on June 25, 2004. R. 207-12. These exams revealed a whole person impairment of 16% and 15% respectively. R. 217, 211. A handwritten letter from Lobina Kalam, M.D., dated August 7, 2009, indicated that Ligon came to her office on July 22, 2009, complaining of "low back pain, which shoots down to the left knee." R. 592. She diagnosed Ligon with sciatica and osteoarthritis and prescribed Lyrica and Celebrex twice daily. *Id.* No further information on Ligon's relationship or treatment with Kalam was provided.

C.    *Ligon's Pain and Daily Life Since the Injury*[8]

Since his accident in October 2003, Ligon has consistently complained of lower back pain with stabbing and radiating pain into his left leg and knee. Every medical professional to examine Ligon has concluded that these injuries were causally related to his October 2003 accident. *E.g.*, R. 336, 303.

Following the accident, Ligon moved in with his father. R. 57, 481. His father became seriously ill in 2005 and eventually died in May 2007. R. 482. Ligon cared for his father as best he could until his father's death, although, because of Ligon's injuries, his brother had to come over daily to assist them. R. 481. Ligon has been financially supported by his brother since 2005. R. 482.

1.    *2006 Disability Report*

In the Disability Report that Ligon submitted in July 2006 in conjunction with his claim for disability benefits, R. 70-89, he described his pain as a "stabbing" sensation that emanated from his lower back and radiated to his left knee. The pain occurred daily, and was triggered by just getting off the couch. The pain was particularly intense for periods of about ten minutes. Three times a day he took Tylenol with codeine, which somewhat decreased the pain, but the relief lasted only two hours and the medicine caused him to fall asleep. He reported that he could stand and walk for only ten minutes each. He needed to alternate between sitting and standing, and could not kneel or squat. He could climb stairs slowly. He used a cane and brace when walking outside. He could not lift more than five pounds, and he felt pain when he reached for anything. His hands trembled when he used them. He had trouble paying attention but could

---

[8]    The facts in this section are taken from Ligon's responses in his Disability Report, R. 70-89, which he submitted on July 7, 2006, in connection with his application for SSI benefits; and from Ligon's testimony at the disability benefit hearings held on November 27, 2007, R. 433-55, and August 12, 2009, R. 600-58.

complete a task once he started it.  He also stated that he had anxiety around cars and sometimes had difficulty remembering things.

Ligon also explained in his Disability Report that prior to his injuries he could exercise, work, and regularly engage in hobbies such as fishing and shooting pool.  After his injury he was no longer able to participate in any of these former activities.  His daily activities consisted only of washing up, eating meals, attending physical therapy, watching TV, and sitting on a bench in front of his building.  Ligon spoke briefly to people on the phone approximately once a day, but no longer visited friends.  The only places he regularly visited were medical offices.  He no longer attended church.  His pain prevented him from sleeping at night.  He could no longer perform household chores.  He sometimes relied on the assistance of his father to get dressed or to shave his head.  His pain prevented him from cooking as much as he used to; he relied on his mother to prepare his meals, except for simple meals he prepared approximately twice a week. He was unable to drive on a regular basis, and used public transportation to go to physical therapy two times per week and to doctors' offices once per month.  He was still able to pay his bills and to manage his own finances.

2.    *2007 Hearing Testimony*

At his disability hearing on November 26, 2007, R. 433-55, Ligon testified that despite undergoing arthroscopic surgery in 2004, he continued to experience pain in his left knee, which prevented him from sitting for too long.  Ligon testified that he had difficulty sleeping at night due to pain. He woke up from pain at night and had to take medication to fall back asleep. For two to three hours each day, he would lie on his back on the floor with his legs propped up on a pillow to alleviate pain in his lower back; frequently he even slept on the floor.  When he

wasn't lying on the floor, Ligon spent his days sitting on a bench outside for about an hour and walking around by the grass. Although he had a driver's license, he very seldom drove because his left knee would hurt from sitting. His brother did the laundry and shopping; Ligon sometimes accompanied him for the shopping, but his brother did all the lifting. Sometimes Ligon would try to take out the garbage, but if it was too heavy, he would just have to drop it and leave it for his family to take out.

Out of an eight-hour workday, Ligon estimated that he could sit for a total of 3 hours, in periods of 90 minutes at a time, although he began to feel pain after sitting for 10 minutes. He estimated that he could stand for a total of 1.5 hours in an eight-hour workday, in intervals of about 45 minutes to 1 hour. He could walk about three to four blocks before needing to stop and hold a pole because of pain in his lower back. He used a cane prescribed by his doctor to support his left knee, as well as a back and knee brace. He could climb and descend stairs, but only very slowly and with his cane, because sometimes he lost feeling in his left leg. He could lift around 10 to 15 pounds.

He equivocated about whether he could do a security surveillance-type job in which he would watch TV monitors and alert ground teams to activity. He first worried that "I couldn't sit too long and I can't stand that long or do too much walking either." R. 440. However, when pressed by the Administrative Law Judge ("ALJ"), he conceded he could perform the job if it allowed him to alternate between sitting and standing. R. 440-41. However, Ligon advised that his back and knee pain would prevent him from taking public transportation to any job on a daily basis. R. 449.

Ligon explained that he had stopped his physical therapy and doctors' visits a few months before the 2007 hearing because he had recently received a lump-sum workers'

compensation settlement and consequently workers' compensation would no longer pay for his medical treatment.

3.     *2009 Hearing Testimony*

After my decision remanding the case in 2008, a supplemental disability benefits hearing was held on August 12, 2009, R. 600-58, at which Ligon testified. R. 604-36. Ligon testified that he continues to experience lower back pain and pain and tingling in his left leg as a result of the 2003 accident, and indeed that his condition had gotten worse over time. Ligon stated that his days are now mostly spent lying on his back on the floor to relieve the pain. Out of an eight-hour workday, he spends approximately six hours lying on the living room floor. He also sleeps there. Consequently, he testified, he would no longer be able to perform a job where he did not have the option of lying down on the floor, such as monitoring a television for a security company.

Ligon lives by himself in his father's former apartment, although his elderly mother and brother come over to perform all of his household chores; they cook, clean, do laundry, and shop for him. Ligon has difficulty dressing himself and sometimes his brother has to help. His typical day consists of lying on the floor watching television, getting up and looking out the window, going downstairs to sit on a bench for 45 minutes or so, and walking around a little bit in the flower beds around his apartment. He does not visit any friends because his pain prevents him from traveling. He has a driver's license but doesn't drive. He cannot take public transportation every day because it causes him pain.

Ligon can walk about three blocks before having to stop and rest from the pain. In an eight-hour workday, he can stand for only 90 minutes total and sit for 90 minutes total,[9] although he feels pain from sitting or standing after 10 minutes. Climbing stairs causes him pain, and lifting more than ten pounds causes him lower back pain. He cannot stoop or bend or reach. Ligon uses his cane because he sometimes loses all feeling in his left leg when he walks down steps. He also continues to take Tylenol with codeine along with a prescription painkiller daily. When first asked, he described the level of his back pain as a 10 out of 10, R. 615-16, but later clarified that it was a 9 at that moment, and medication can reduce it to a 7. R. 625. His pain gets worse in the wet and cold. R. 624. Fifty minutes into the hearing, Ligon had to stand up to alleviate his pain from prolonged sitting.

D.      *Expert Testimony*

1.      *Dr. Donald Goldman, Independent Medical Expert*

Dr. Donald Goldman testified as an independent medical expert ("IME") at Ligon's second hearing in 2009. Although Goldman reviewed Ligon's record, he never examined Ligon himself. R. 632. Goldman testified that, in his opinion, Ligon had back and knee injuries. He had herniations at two levels in his spine, and, as a result, he required conservative care for his back and surgery for his knee. R. 637. Goldman posited that based on "the amount of treatment he had and the ongoing therapy and the MRI's, et cetera, there is an indication that [Ligon] would have at least equaled a listing."[10] R. 638. Goldman stated later that Ligon did "[n]ot clearly" meet or equal a listed impairment, as Goldman was unsure of the

---

[9]      Ligon's testimony is ambiguous as to whether these figures represent his capacities in 2006 or at the time of the hearing in 2009. However, it appears that Ligon was testifying as to his present condition, in spite of his attorney's repeated references to 2006.

[10]      As explained in more detail below, an impairment that is listed in 20 C.F.R. § 404 Subpart P, app.1, qualifies as a *per se* disability under the social security regulations.

medical sources' findings with regard to Ligon's extension and flexion ability. R 638-41. Goldman also stated that Ligon's back injury would cause functional limitations and his knee injuries would probably cause limitations, as well. R. 641.

Goldman testified that some of Ligon's claims and some of Hedyrch's findings were inconsistent with the rest of the record because he considered it implausible that a "big guy" like Ligon would be unable to lift more than ten pounds. R. 645. Goldman questioned whether Ligon was limited to sitting for only 10 to 15 minutes intervals, but could not state an opinion as to whether Ligon could sit for 50 minutes at a time. *Id.* Goldman also testified that, without examining Ligon himself, he could not form an opinion as to whether Ligon's cane was medically necessary or whether his condition had deteriorated since his initial evaluations. R. 64d-46. Goldman also opined that Ligon would need to limit standing and walking to a third of the day. R. 641. Goldman offered nothing more about Ligon's tolerance for sitting. *Id.*

2. *Julie Andrews, Vocational Expert*

A vocational expert, Julie Andrews, also testified at the 2009 hearing.[11] The ALJ asked Andrews to consider a hypothetical claimant of Ligon's age, education and past work

---

[11]     Under the SSA regulations:

> A vocational expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work . . . . In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

20 C.F.R. § 404.1560(b)(2).  If the claimant's limitations prevent him from being able to perform his past relevant work, the ALJ must determine whether any "other work exists in significant numbers in the national economy that [the claimant] can do."  *Id.* § 404.1560(c)(2).

experience, with the following limitations: The claimant would require a "sit/stand option," meaning that he could alternate sitting and standing; he could stand or walk about two hours in an eight-hour workday; he could sit at least six hours in an eight-hour work day; he could not be required to lift more than 20 pounds, must avoid overhead lifting and carrying, and must not be required to walk for more than three blocks or for more than 10 to 15 minutes. R. 654. Andrews testified that, given these hypothetical restrictions, Ligon would be unable to perform his past relevant work. *Id.* However, she testified that an individual with these restrictions could perform two jobs available in significant numbers in the national economy: small products assembly positions, of which there are 513,000 jobs nationally and 2,541 jobs regionally, and order clerk positions, of which there exist 255,000 positions nationally and 2,120 jobs regionally. R. 654-55.

Ligon's counsel asked Andrews whether there would be any jobs available to someone with Ligon's age, education, and past work experience, who needed to lie on the floor for three to six hours a day. R. 656. Andrews testified that no jobs existed in significant numbers in the national economy given those limitations. *Id.* Counsel for Ligon also asked Andrews whether there were any positions that existed in significant numbers in the economy that would be available to a person who can only stand for two hours, sit for two hours, and walk for two hours in an eight-hour workday. Andrews said there would be no full-time positions that could accommodate those limitations, because the hours do not add up to an eight-hour workday. R. 656-57.

E.      *Procedural History*

On May 10, 2006, Ligon applied for SSI benefits claiming that he was disabled due to injuries to his back and knee sustained as a result of the October 2003 accident. R. 60.

His application was denied.  R. 18.  Ligon then requested a hearing before an ALJ, which was held on November 26, 2007.  R. 433-55.  ALJ Neil Ross presided over the hearing via videoconference.  R. 11.  Ligon was represented by counsel.  *Id.*  In a decision dated November 30, 2007, the ALJ found that Ligon was severely impaired due to herniated lumbar discs and derangement of the left knee, but that this impairment did not meet or medically equal one of the listed impairments in the regulations.  R. 13, 16.  The ALJ found that Ligon was unable to perform his past relevant work, but retained the residual functional capacity ("RFC") to perform the full range of light work.  R. 16.

On February 28, 2008, the Appeals Council denied Ligon's request for review, rendering ALJ Ross's decision the then-final decision of the Commissioner.  R. 4-6.  Ligon filed a complaint in this court on April 14, 2008, seeking reversal of the Commissioner's decision.  On December 23, 2008, I granted Ligon's motion for judgment on the pleadings in part and remanded the case for a new hearing.

On August 12, 2009, ALJ Jeffrey M. Jordan presided over a supplemental hearing, in which Ligon appeared and testified, as did Goldman, the medical expert, and Andrews, the vocational expert, who testified by telephone.  R. 600-658.  Ligon was again represented by counsel.  R. 502.  In a decision dated November 2, 2009, ALJ Jordan found that Ligon was severely impaired from disorders of the back and left knee, but found this impairment did not meet or equal the SSI listed impairments.  R. 504-05.  ALJ Jordan then concluded that Ligon had the RFC to perform less than the full range of light work as defined in 20 C.F.R. § 416.967(b).  The ALJ concluded that Ligon was able to lift and carry 20 pounds occasionally and 10 pounds frequently, and could stand for two hours and sit for six hours in an eight-hour workday.  R. 505.  The ALJ concluded that these limitations ruled out Ligon's past relevant

work, but permitted Ligon to perform other jobs that exist in significant numbers in the national

economy, such as a small products assembler, an order clerk, or a preparer.  R. 517.

On November 18, 2010, the Appeals Council declined to assume jurisdiction over

Ligon's case, rendering ALJ Jordan's decision the final decision of the Commissioner.  R. 456.

Ligon filed the instant case in this court on January 6, 2011.  ECF No. 1.  The parties cross-

moved for judgment on the pleadings.  Oral argument was held on January 5, 2012.

## DISCUSSION

A.      *Legal Standards*

Under 42 U.S.C. § 405(g), I review the record *de novo* and can reverse the

Commissioner's denial of benefits if it is based on legal error or is not supported by substantial

evidence in the record.  *See Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007); *Rosa v.

Callahan,* 168 F.3d 72, 77 (2d Cir. 1999).  If I find that the Commissioner has applied the proper

legal standard, my review is limited to determining whether the findings of fact are supported by

substantial evidence.  If they are, I will deem them conclusive.  *Parker v. Harris*, 626 F.2d 225,

231 (2d Cir. 1980).  I should remand if the Commissioner has not applied the correct legal

standard or if there are gaps in the record.  *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir. 1982).

When a record persuades me that a disability exists and remanding for further proceedings would

provide no purpose, I may reverse the decision and remand only for the calculation and payment

of benefits.  *Parker*, 626 F.2d at 235 ("[W]e have reversed and ordered that benefits be paid

when the record provides persuasive proof of disability and a remand for further evidentiary

proceedings would serve no purpose.").

When evaluating this evidence, I must be satisfied that "the claimant received 'a

full hearing under the Secretary's regulations and in accordance with the beneficent purposes of

the Act.'" *Vargas v. Astrue*, No. 10-CV-6306, 2011 WL 2946371, at *8 (S.D.N.Y. July 20, 2011) (quoting *Echevarria v. Secretary of Health and Human Services*, 685 F.2d 751, 755 (2d Cir. 1982)). I must make a "searching investigation" of the claimant's entire record to ensure that the ALJ protected the claimant's rights, *Vargas*, 2011 WL 2946371 at *8, and to ensure that the ALJ took affirmative steps to completely and fairly develop the record, as SSI hearings are non-adversarial. *See* 20 C.F.R. § 416.1400(b) (requiring the Social Security Administration to "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . .").

Under the Act, a claimant is disabled, and thus entitled to benefits, when he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "Substantial gainful activity" need not solely include the claimant's previous work, but encompasses any work, which "considering his age, education, and work experience . . . exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

It is up to the Commissioner to decide whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.927(e)(1). The Social Security Administration sets forth guidelines that govern the Commissioner's decision. This analysis is broken down into a five-step sequential process:

> First, the Commissioner of Social Security considers whether the
> claimant is currently engaged in "substantial gainful activity." If

he is not, the Commissioner proceeds to the second step and
determines whether the claimant has a severe medically
determinable physical or mental impairment that significantly
limits his physical or mental ability to do work activities.  If the
claimant does suffer such an impairment, the third step is whether,
based solely on medical evidence, the claimant has an impairment
which is listed in Appendix 1 of the regulations.  If so, the claimant
is *per se* "disabled" and thus presumptively qualified for benefits.
If not, the Commissioner proceeds to the fourth step and examines
whether, despite the claimant's severe impairment, he has the
residual functional capacity to perform his past work.  If the
claimant is unable to perform his past work, the Commissioner
finally determines whether there is other work the claimant can
perform, taking into consideration the claimant's RFC, age,
education, and work experience.

*Petrie v. Astrue*, 412 F. App'x 401, 404 (2d Cir. 2011) (citations and internal quotation marks

omitted); *see also* 20 C.F.R. § 416.920(a)(4) (setting forth this process).  A claimant's RFC,

which is crucial to the ALJ's fourth and fifth steps, is defined as the most a claimant can still do

despite his or her limitations.  20 C.F.R. § 416.945(a).  The RFC is assessed based on all the

relevant evidence in the claimant's record.  *Id.*

In determining whether there is an impairment and deciding the severity of that

impairment, the Commissioner's decision must be "based on objective medical facts, diagnoses

or medical opinions inferable from these facts, subjective complaints of pain or disability, and

educational background, age, and work experience."  *Ventura v. Barnhart*, No. 04-civ-9018,

2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing *Mongeur v. Heckler*, 722 F.2d 1033,

1037 (2d Cir. 1983)).  The Commissioner must "review all of the medical findings and other

evidence that support a medical source's statement that [a claimant is] disabled."  20 C.F.R. §

416.927(d)(1).

The claimant bears the burden of proof for the first four steps.  *See Rosa,* 168 F.3d

at 77.  If the claimant has fulfilled his burden under the first four steps, the burden shifts to the

Commissioner at step five.  *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).  However, this

is only a limited shift, as "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." *Id.* (citing 20 C.F.R. § 404.1560(c)(2)).

B.      *ALJ Jordan's November 2009 Decision*

Applying the five-step sequential evaluation prescribed by 20 C.F.R. § 416.920(a)(4), ALJ Jordan found at step one that Ligon had not engaged in substantial gainful activity since at least May 10, 2006, the date he filed his application. R. 504. At step two, he found that Ligon had "severe" impairments under 20 C.F.R. § 416.920(c) – namely, "disorders of the back and left knee." *Id.* The decision also noted a non-severe impairment of hypertension. R. 505. At step three, the ALJ found that Ligon's impairment or combination of impairments did not medically equal any of the listed impairments contained in Appendix 1 to Subpart P of Part 404 of the Social Security Administration's regulations.[12] *Id.* At step four, the ALJ found that Ligon retained the RFC to lift 20 pounds occasionally and 10 pounds frequently, but needed to avoid overhead lifting or carrying. *Id.* The ALJ also concluded that Ligon had the RFC to stand or walk for up to two hours in an eight-hour work day, and sit for up to six hours in an eight-hour workday. *Id.*

Based on these findings and the testimony of the vocational expert, the ALJ concluded at the fourth step that Ligon would not be able to perform any of his past work, which included working as a maintenance worker, floor waxer, security guard or parking lot supervisor. R. 516. However, at the fifth and final step, the ALJ found, using the Medical-Vocational guidelines and the testimony of the vocational expert, that Ligon's RFC, considered in combination with his age, level of education, and work experience, allowed him to perform jobs

_____

[12]      The ALJ considered sections 1.02 (Major Dysfunction of a Joint(s)) and 1.04 (Disorders of the Spine). R. 505.

with a "sit/stand" option that required up to six hours of sitting and two hours of standing. R. 517-18. The ALJ determined that Ligon could perform work as a small products assembler, order clerk, or preparer, all of which exist in significant numbers in the national economy. R. 517.

C.    *Analysis*

    1.    *The Treating Physician Rule and Evaluation of Medical Evidence*

Under the Social Security regulations, a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011). A treating source is defined as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 CFR § 404.1502.[13] Treating physicians' opinions are generally controlling because "these sources are

---

[13]    By contrast, a *non-treating* source is defined as a "physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502. Consultative examiners for the state or SSA are classified as non-treating sources. *Id.*

    In general, the Commissioner must consider the opinion of *any* medical source, treating or non-treating, examining or non-examining. The weight to be accorded a medical source opinion of any sort is determined based on: (1) the examining relationship – more weight is given to the opinion of a source who has examined the claimant than to the opinion of a source who has not; (2) the treatment relationship – more weight is given to treating sources; (3) supportability – more weight is given if the medical source supports his opinion with relevant evidence in the record, "particularly medical signs and laboratory findings," or provides a good explanation for his opinion; (4) consistency – more weight is given the more consistent an opinion is with the record as a whole; (5) specialization – more weight is given to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a

likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."  20 C.F.R. § 404.1527(c)(2).  The Commissioner must provide "good reasons" for not according the opinions of a treating physician controlling weight.  *See, e.g.*, *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians [sic] opinion and we will continue remanding when we encounter opinions from ALJ's [sic] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

Moreover, "even when a treating physician's opinion is not given 'controlling' weight, the regulations require the ALJ to consider several factors in determining how much weight it should receive."  *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(2)); *see also Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).  The ALJ must consider: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (quoting *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998)).  With respect to the length of treatment, the regulations provide that "[g]enerally, the longer a treating source has treated [a claimant] and the more times [a claimant has] been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion."  20 C.F.R. § 404.1527(c)(2)(i).  "When the treating source has seen

---

source who is not a specialist; (6) other factors – weight may be accorded based on any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c).

[the claimant] a number of times and long enough to have obtained a longitudinal picture of [his or her] impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." *Id.* With respect to the nature and extent of the relationship, the treating source opinion is accorded more weight if the treating source provided treatment to the claimant for the very impairment for which he is seeking disability – particularly if it falls within his or her area of specialty. *See id.* § 404.1527(c)(2)(ii), (c)(5). Although the ALJ is given discretion in weighing all medical opinion evidence, 20 C.F.R. § 416.927(c), the ALJ is required to explain and justify the weight given to treating source opinions when they are found not to be controlling. *See Snell*, 177 F.3d at 133.

After ALJ Ross's decision in 2007, I remanded with specific instructions to provide good reasons for not giving Hedrych's opinion controlling weight. *See Ligon*, 2008 WL 5378374, at *9-*12. On remand, ALJ Jordan identified both Morgenstern and Hedrych as treating sources with an appropriate area of expertise. R. 515-16.[14] However, the ALJ refused to accord controlling weight to Hedrych's and Morgenstern's opinions – indeed, he specifically accorded them only "little" weight. *Id.* The ALJ also specifically accorded "little" weight to

---

[14]     The ALJ also purported to classify Glassman, the doctor from the New York State Insurance Fund, as a treating source, R. 516, although the government did not attempt to defend that classification in this court. *See* Comm'r Mem. at 40-41 (classifying only Morgenstern and Hedrych as treating sources); Tr. 23 ("Dr. Glassman . . . [was] maybe not . . . a treating doctor but he examined him three times . . . ."). The ALJ's decision offers no opinion as to whether Berkowitz was a treating source, even though Berkowitz performed Ligon's knee surgery and saw Ligon on an ongoing basis throughout 2004 and 2005. No RFC Assessment from Berkowitz appears in the record.
        Ligon's non-treating examining sources included: Zaretsky, an orthopedic surgeon who examined Ligon on August 26, 2005 in connection with his workers' compensation claim, R. 326-28; Khakhar, a physiatrist, who examined Ligon on August 11, 2005, R. 157-58, and September 22, 2005, R. 155-56; Blonder, who examined Ligon on April 20, 2006, R. 301-03; Mescon, who performed a consultative internal medicinal examination on Ligon on July 31, 2006, R. 182-86; and Zheng, who performed a consultative orthopedic examination of Ligon on June 6, 2009, R. 580-83. Accepting the government's current litigation position, Glassman is also a non-treating source.

Blonder's opinion and Zheng's RFC Assessment. *Id.* By contrast, the ALJ chose to give "great weight" to Goldman's testimony, "significant" weight to the opinions of Zaretsky and Mescon, "considerable weight" to Glassman's findings, and "some" weight to Khakher's findings. R. 514-16. The ALJ gave "significant" weight to Zheng's physical examination report from June 6, 2009, but "little" weight to Zheng's RFC Assessment completed on June 13, 2009. R. 514-15.

In discounting Hedrych's opinions, the Commissioner *again* relies on the purported absence of clinical findings supporting his opinion, as well as a purported admission by Hedrych that this is true.[15] Yet the record provides ample evidence to support Hedyrch's findings. As I explicitly mentioned in my previous opinion, Hedrych's records

---

[15] This latter point refers to a "phone contact" appearing at R. 189. The "report of contact" signed by "RR" of "DDS" states "Dr. Hedrych cannot give objective findings to corroborate his RFC. His RFC is based on claimant's complaints." *Id.* ALJ Ross described the record as demonstrating that Hedrych "admitted . . . to the State Agency disability examiner in September 2006" that there was "a lack of objective clinical findings to support Dr. Hedrych's residual functional capacity assessments." R. 17. ALJ Jordan claimed the phone record revealed "that [Hedrych's] opinions were based mainly on the claimant's reports and allegations rather than on clinical findings." R. 515.

The dubious origins and significance of this phone record featured prominently in my order remanding the case in 2008. *Ligon*, 2008 WL 5378374, at *11. Yet the Commissioner's memorandum fails to address or even acknowledge the concerns I raised in my prior opinion about this record. When questioned at oral argument, the Assistant United States Attorney ("AUSA") stated that it appeared that Ruth Rosenfeld, a non-medical employee of the state Division of Disability Determinations, telephoned Hedrych to seek clarification of his report. Tr. 13. There is no further information regarding what Hedrych said to "RR."

This phone contact does not undermine Hedrych's repeated objective clinical findings, which he integrated with his longitudinal familiarity with Ligon's condition to form his professional medical opinion. Moreover, Hedrych conducted subsequent physical examinations of Ligon, in which he made further clinical findings, *after* this alleged phone contact dated September 14, 2006. On October 4, 2006, Hedrych examined Ligon, recording detailed findings of Ligon's gait; heel- and toe-walking; spine range of motion, flexion, extension, rotation, palpation, and tone; straight-leg raising (finding a positive Lasegue's sign); left knee tenderness, extension, flexion, and McMurray's sign; neurologic responses; and atrophy in quadriceps. R. 290. On December 18, 2006, Hedrych again saw Ligon and made similar findings. R. 287. And Hedrych's RFC Assessment, which represents his considered opinion taking into account the full medical history of Ligon, was completed on November 19, 2007. R. 414-23.

are replete with evidence in support of his diagnoses and clinical findings regarding functional limitation. Over the course of nine months in 2006, his physical examinations consistently found that Ligon had (1) a markedly antalgic gait with splinted torso, favoring his left lower extremity; (2) a markedly limited heel walking associated with weakness and left lower extremity radicular pain and low back pain and an inability to walk on his toes; (3) a limited range of motion in his spine (*e.g.*, pain with limitation of flexion ranging from 15-45, extension ranging from . . . 0-5, lateral flexion to the right ranging from 5-10 and left ranging from 10-15); (4) a marked paravertebral muscle spasm; (5) positive straight leg raising; (6) medial joint line tenderness in the knee; (7) decreased sensation over the L4-5, L5-S1 dermatomes[;] and (8) left quadriceps muscle mass and tone loss. R. 286-300. And there is no dispute that Ligon's records further reveal that he suffered herniated lumbar discs and left knee derangement. All of the foregoing findings support Hedrych's opinion.

*Ligon*, 2008 WL 5378374, at *11. The AUSA admitted at oral argument that Hedyrch's reports included objective clinical findings. Tr. 15. There is no prohibition on a doctor's considering the patient's subjective complaints in addition to objective clinical data in rendering prognoses and treatment decisions. Indeed, this holistic vantage point is the very reason that treating source opinions are "unique[ly]" valued under the social security regulations. 20 C.F.R. § 404.1527(c)(2). Yet ALJ Jordan still persists in the erroneous view that Hedrych's conclusions were "not supported by clinical findings." R. 515. This was clearly wrong. Given Hedrych's status as a treating physician with specialized expertise in the relevant area, the ALJ was obligated to accept this opinion as controlling.

The ALJ's second reason for refusing to award Hedyrch's opinions "controlling" weight, and instead awarding them only "little" weight, was their alleged inconsistency with the "evidence as a whole." *Id*. This rationale is unfounded. Every single medical source who

examined Ligon confirmed the serious and prolonged impairment in his back and left leg.[16] Indeed, the record is remarkable for its consistency in this regard. And the only two medical professionals who completed RFC Assessments in this case – Hedrych and Zheng – both concluded that Ligon was seriously restricted in his capacity for sitting, standing, and walking.[17]

After disregarding the opinions of Ligon's primary treating physicians (Hedrych, Morgenstern, and Berkowitz) and the opinion of Ligon's most recent examining physician (Zheng), the ALJ privileged the opinions of Glassman, Zaretsky and Mescon, none of whom had a treating relationship with Ligon. In fact, Mescon and Zaretsky each saw Ligon only once, and Glassman saw him only three times. All three were hired by the state to perform their exams. Mescon is apparently an internal medicine doctor without a relevant specialty. Glassman's and Zaretsky's exams occurred over eight years ago, in 2004 and 2005 – over a year before Ligon even applied for SSI benefits. The record supports an inference that Ligon's condition has progressively deteriorated. Ligon himself testified that he's gotten worse since the accident. R. 624. In 2006, both Blonder and Hedrych concluded that Ligon was "total[ly]" disabled. R. 287, 290, 293, 296, 299, 302, 305, 309. And in 2009, Zheng concluded that Ligon was seriously incapacitated and limited in his ability to sit, stand, and walk, among other activities. R. 584-85. Instead of according them "significant" and "considerable" weight, the ALJ should have discounted Glassman's, Mescon's, and Zaretsky's opinions for lack of a treatment relationship,

---

[16]     Indeed, even Glassman concluded that Ligon had a "mild disability" and that there was "objective evidence of a need to limit work status and/or activities of daily living." R. 313. Mescon too concluded that Ligon was "moderately restricted by back and knee pain." R. 185.

[17]     Hedrych concluded that in an 8-hour workday, Ligon could sit for 1-2 hours, stand for 1-2 hours, and walk for up to 2 hours. R. 415. Zheng concluded that in an 8-hour workday, Ligon could sit for up to 3 hours, stand for 2 hours, and walk for 2 hours. R. 584-85. Notably, under either of these RFC assessments, Ligon would be unable to sit, stand, or walk for a full 8-hour day, no matter how often he is permitted to change position.

infrequency of examinations, lack of specialty, and the long passage of time since the examinations with evidence of deterioration. *See* 20 C.F.R. § 404.1527(c). Reports and opinions from physicians who treated Ligon and who examined him more recently and more frequently should be accorded greater weight, not less weight.

The ALJ also gave "great" weight to the opinion of the impartial medical expert, Goldman. Goldman's opinion was based solely on his review of Ligon's medical record. Generally, more weight is given "to the opinion of a source who has examined [a claimant] than to the opinion of a source who has not examined [a claimant]." 20 C.F.R. § 404.1527(c)(1). Thus, Goldman's opinion should be generally accorded less weight than any doctor who actually examined Ligon, treating or non-treating. As Goldman has no examining or treatment relationship with Ligon, Goldman's opinion is only as persuasive as the underlying evidence on which it is based – a point conceded by the AUSA at oral argument. Tr. 7-8. Goldman's opinion cannot dislodge the record evidence itself.

Moreover, the ALJ overstated the extent to which Goldman's testimony contradicted Hedyrch's opinions. In his opinion, the ALJ attributed to Goldman the statement that Hedrych's opinions "are not supported by the objective medical evidence." R. 513. However, Goldman merely said he did not "know if there was an orthopedic surgeon that accurately made [a flexion] assessment." R. 641. Goldman also disagreed only with a singular finding of Hedrych's – the finding that Ligon could never lift more than 10 pounds. R. 645. Goldman disagreed with this contention solely because of Ligon's size. R. 645. Goldman never explained why Ligon's size alone would ensure that he could lift more than 10 pounds. Notably, Goldman did not express any disagreement with Hedrych's opinion that Ligon could sit for only two hours in an eight-hour workday.

The ALJ's failure to accord Hedrych's opinions controlling weight constitutes legal error. *See Burgess*, 537 F.3d at 129-30 ("Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.") (quoting *Snell*, 177 F.3d at 133); *see also* 20 C.F.R. § 416.927(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion.").

### 2.  *The ALJ's Mischaracterization of the Record*

The overstatement of Grossman's testimony in discounting Hedrych is just one of the ways that the ALJ's opinion fails to be faithful to the record.  The ALJ's decision repeatedly mischaracterizes the record adversely to Ligon, leaving me with the impression that Ligon did not get a fair shake.

The ALJ claimed that Goldman "testified that the claimant's impairments did not meet or equal a listed impairment."  R. 513.  This is not a fair description of Goldman's testimony.  First, Goldman actually said that Ligon's knee injury did meet a listed impairment, but it had lasted for less than 12 months.  R. 637-38.  Then, when asked about the period pertaining to Ligon's filed claim, Goldman said "[b]ased upon the amount of treatment he had and the ongoing therapy and the MRI's [sic], et cetera, there is an *indication that he would have at least equaled a listing*," but Goldman said he could not tell how incapacitating the problem was from the record.  R. 638 (emphasis added).  After this testimony, the ALJ asked Goldman again if Ligon equaled a listed impairment, and Goldman again did not answer definitively.  Instead, Goldman testified that Ligon's impairment did "not clearly" meet or equal a listed impairment.  R. 641.  After this hesitant statement, the ALJ resorted to leading Goldman, asking "So your opinion would be he does not equal a listing?"  *Id.*  Goldman replied, "Right," yet even

then, he immediately qualified his response by explaining he was unsure if there was an accurate orthopedic assessment conducted to make a true finding. *Id.* The ALJ's decision does not reflect Goldman's equivocation, stating simply that Goldman "testified that the claimant's medical impairments did not meet or equal a listed impairment." R. 53. This is a clear mischaracterization of Goldman's testimony.

The same is true with respect to the ALJ's claim that Ligon "lives alone and cares for himself without assistance." R. 514. In fact, Ligon consistently reported to doctors and testified at the hearings that his brother and mother come over daily to do shopping, cooking, cleaning, laundry, and other household chores. R. 73-74, 183, 581, 622. At the time he filed his application for disability benefits until May 2007, Ligon lived with his father, who would sometimes help him dress and shave. R. 57, 71-73.

The ALJ's opinion also states that Ligon "reported [to Mescon] that he was able to shower, dress and bathe himself. Someone else did his shopping, cooking and cleaning, *though the claimant did not state he was unable to.*" R. 511-12 (emphasis added). This latter assertion is neither a literal restatement of Mescon's report nor a natural inference from it. Mescon's report does not say one way or another whether Ligon reported that he was unable to perform those tasks. She recorded only that he said someone else did them. Moreover, the clear inference from Mescon's report is that Ligon did not shop, cook, or clean because he was unable to. Further, in case the ALJ truly entertained any doubt about why "someone else did" these household chores, the record contains multiple reports by Ligon that he is unable to shop, cook, or clean due to pain. *E.g.*, R. 74 (cannot do house work because "too much pain"); 622 (cannot do laundry, shop, clean, or "anything" around the house because "I be in pain with my lower back"). In fact, Zheng's examination report specifies expressly that Ligon "does not do

cleaning, laundry, shopping *because of the pain*." R. 581 (emphasis added). This is the same examination report of Zheng's to which the ALJ purportedly accorded "significant" weight.

The ALJ's statement that Ligon "did not appear to be in discomfort at the hearing, which lasted over one hour, or show outward signs of pain" is alarmingly false. R. 514. To the contrary, Ligon testified that he was in pain at that very moment, and he stood up after 50 minutes because of the pain. R. 631. The ALJ went out of his way to record the exact time at which this occurred. *Id.* Ligon's behavior at the hearing was perfectly consistent with his statements that he is able to sit for a total of 90 minutes and begins to feel pain after sitting for 20 minutes. R. 617-19.

The ALJ also stated that Ligon engaged in a "reasonably broad range of daily activities." R. 514. Ligon stated that he spends most of his days "lay[ing] on the floor." R. 617-18. His typical day consists of watching TV, looking out the window, sitting on a bench in front of his house for 45 minutes, and attempting to walk around a little. R. 623. Ligon's true daily reality is a far cry from a "broad range of daily activities."

The repeated mischaracterizations of the record adversely to Ligon impaired the ALJ in performing all of his important duties: according proper weight to the treating physicians, evaluating Ligon's credibility, and developing the record.


3.      *The ALJ's Adverse Credibility Finding*

To decide whether a claimant is disabled, the Commissioner must consider the subjective evidence of pain or disability testified to by the claimant. *See* 20 C.F.R. § 416.929(a). The ALJ has discretion to "evaluate the credibility of the claimant's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true

extent of such symptomatology." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995). The claimant's statements about pain cannot alone establish disability; "there must be medical evidence that shows that the claimant has a medically determinable impairment that could reasonably be expected to produce the pain or other symptoms alleged," *Davis v. Massanari*, No. 00-CV- 4330, 2001 WL 1524495, at *6 (S.D.N.Y. Nov. 29, 2001), though there need not be "direct medical evidence confirming the extent of the pain." *Snell,* 177 F. 3d at 135.

The Commissioner must use "all of the available evidence" to assess the credibility of the claimant's subjective symptoms. *Davis,* 2001 WL 1524495, at *6 (citing 20 C.F.R. § 416.929(c)(1)). Social Security Administration regulations acknowledge that because "symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [the ALJ shall] . . . carefully consider any other information [that the claimant] may submit about [his] symptoms . . . including information about [the claimant's] prior work record, [claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] treating or nontreating source, and observations by [agency] employees and other persons." 20 C.F.R. § 416.929(c)(3).

Seven factors are used in evaluating a claimant's subjective complaints: (1) the individual's daily activities; (2) the location, duration, frequency and intensity of the individual's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual received or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.,* lying flat on his or her back, standing for fifteen to twenty minutes every hour, or sleeping on a board); and (7) any other factors concerning the

individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c)(3)(i)-(vii).

If the ALJ decides to discredit the claimant's subjective complaints, the ALJ must provide the reasons with "sufficient specificity to enable the district court to decide whether the determination is supported by substantial evidence." *Miller v. Barnhart,* No. 02-CV-2777, 2003 WL 749374, at *7 (S.D.N.Y. Mar. 4, 2003) (citation and internal quotation marks omitted); *see also* S.S.R. 96-7P, 1996 WL 374186, at *4 ("[T]he adjudicator must . . . give specific reasons for the weight given to the individual's statements.").

The ALJ wrote in his opinion that Ligon's impairments could reasonably cause his symptoms, but that his "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible." R. 513. The ALJ supported this finding by noting that Ligon's muscle strength was only slightly reduced, and his lumbar sacral spine X-rays were normal in July 2006. R. 513-14. The ALJ also noted that Ligon's treatment has been "conservative." R. 514. The ALJ further found Ligon non-credible because he had not been hospitalized and had not received progressive treatment. *Id.* He found Ligon's use of a cane to be medically unnecessary, and that his medicine dosages were "not unusual" and caused no side effects. *Id.* The ALJ contended that Ligon "did not appear to be in discomfort at the hearing . . . or show outward signs of pain." *Id.* Finally, the ALJ observed that Ligon "engages in a reasonably broad range of daily activities," including taking public transportation to his therapy sessions, and that he is able to "live[] alone and care[] for himself without assistance." R. 513-14. Therefore, the ALJ concluded that Ligon was not credible and was exaggerating his pain. R. 513. However, this adverse credibility finding was infected with the same mischaracterizations of the record detailed above.

For example, the ALJ emphasized that although Ligon said he needed to use a cane, the record did not establish that the cane was medically necessary. R. 514. Ligon testified that a doctor prescribed him the cane and that he "use[s]" it because "when I go to step down my steps I lose all feeling in my left leg." R. 615. He told Mescon he uses the cane for balance and pain outdoors. R. 183. This testimony is not inconsistent with an ability to ambulate on flat ground in a doctor's office without the cane. In addition, many of the doctors did not question or belabor the medical necessity of the cane; Zheng, for example, concluded that the cane was medically necessary based on its "constant use," without further analysis. R. 581.

In relying on Ligon's treatment regimen and medicine, the ALJ failed to take into account that Ligon stopped receiving regular treatment because his workers' compensation benefits had terminated in 2007. R. 614. Similarly, the ALJ seemed to ignore that the medication Ligon takes is only slightly effective and for only up to two hours at a time. R. 80. Further, the Tylenol with codeine actually does have side effects; it causes Ligon to fall asleep. *Id*.

The ALJ's determination that Ligon's subjective complaints should be discredited lacks the requisite substantial evidence in the record. I am mindful of the fact that "[i]t is the function of the Commissioner, not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant." *Sarchese v. Barnhart*, No. 01-CV-2172, 2002 WL 1732802, at *7 (*quoting Aponte v. Secretary, Department of Health & Human Services*, 728 F.2d 588, 591 (2d Cir. 1984) (second alteration in original) (quotation marks omitted)). However, I conclude that the ALJ did not have substantial support for his adverse assessment of Ligon's credibility. "In light of the ALJ's . . . improper consideration of plaintiff's subjective complaints . . . there is a reasonable basis for doubting the ALJ's conclusion,

and therefore his decision cannot be affirmed." *Smith v. Apfel*, 69 F. Supp. 2d, 370, 377

(N.D.N.Y. 1999).

4.     *The ALJ's Failure To Develop the Record*

In a social security benefits hearing, "'the ALJ, unlike a judge in a trial must . . .

affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits

proceeding,' even if the claimant is represented by counsel." *Tejada v. Apfel,* 167 F.3d 770, 774

(2d Cir. 1999) (quoting *Pratts v. Chater,* 94 F. 3d 34, 37 (2d Cir. 1996)).  The Social Security

Administration states it shall make "every reasonable effort to help [a claimant] get medical

reports from [his or her] own medical sources when [he or she] give[s] [the Administration]

permission to request the reports."  20 C.F.R. § 404.1512(d).  The Administration further

acknowledges its "responsibility" to "develop [a claimant's] complete medical history."  20

C.F.R. § 416.912(d).

Rather than discharge his duty to develop the record, the ALJ relied on gaps and

ambiguities in the record to deny Ligon benefits.  For example, the ALJ stated that he did not

give the opinions of Khakhar and Morgenstern greater weight because they did not provide

sufficient functional capacity assessments.  R. 516.  However, the ALJ never asked these doctors

for such assessments or for their opinions on Ligon's functional abilities and limitations.

Further, nowhere does it appear that the ALJ sought an RFC Assessment from Berkowitz, even

though he was Ligon's treating physician for over a year and performed his knee surgery.

Indeed, from the record, it appears that only two doctors completed the SSA's official RFC

assessment form – Hedrych and Zheng.  Both of these RFC assessments support a finding that

Ligon is disabled.  No other doctors appear even to have been asked to complete an RFC

assessment.

The ALJ's decision to give "significant weight" to Zheng's initial examination report but "little weight" to his functional capacity assessment is unfair and highlights the ALJ's failure to develop the record. R. 514-15. In Zheng's initial examination report he wrote that Ligon was "moderately limited for walking, standing, climbing, lifting, squatting, and bending. No limitation with upper extremity for fine and gross motor activities." R. 582. In his RFC Assessment, Zheng opined that Ligon could sit for only a total of 3 hours and stand and walk for a total of 2 respective hours in an 8-hour workday, each for periods of 30 minutes at a time, and that he could "never" lift or carry 10 pounds. R. 584-85. If the ALJ found it hard to reconcile Zheng's two reports he should have requested clarification of Zheng's assessment. Instead, the ALJ decided to give Zheng's initial evaluation significant weight, while according little weight to the RFC assessment.

Ligon testified that his hand has recently begun to shake. R. 513. The ALJ notes that "there is no evidence in the record of a diagnosis of or treatment for a mental disorder." *Id.* The ALJ appeared to use this absence of evidence to draw an adverse inference about Ligon's credibility and discredit Ligon's subjective claims of pain and disability. Before he did so, the ALJ should have ordered a consultative exam as allowed under 20 C.F.R. § 404.1512(e).

Moreover, the ALJ discredited some opinions of disability on the ground that worker's compensation guidelines are different from SSA guidelines. *See, e.g.*, R. 511. If the ALJ believed that doctors may have evaluated Ligon using the wrong standard, he should have asked the doctors for clarification of their disability determinations or presented them with the differences between workers' compensation and SSI guidelines before discounting their opinions. Instead, the ALJ simply presumed the opinions of disability had no significance or

bearing on his own determination of disability.  A doctor's opinion is not intrinsically suspect because the patient is seeking other benefits.  *See* 20 C.F.R. § 416.927(d)(2).

5.     *The ALJ's Finding that Ligon Could Sit for Six Hours in an Eight-Hour Workday*

The lynchpin of the ALJ's non-disability ruling was his finding that Ligon could sit for up to six hours in an eight-hour workday.  R. 505.  Without this finding, there would have been no jobs that existed in significant numbers in the national economy available to Ligon, according to the testimony of the vocational expert, Andrews.  R. 654-55.  However, nowhere in the record is there evidence of Ligon's ability to sit for six hours in an eight-hour workday.  In fact, the record uniformly contradicts this "finding."  Hedrych's RFC Assessment specifically provided that Ligon could only sit for up to two hours total in an eight-hour workday and only in 10-15 minute intervals.  R. 415.  Zheng, the only other doctor to complete an RFC assessment, concluded that Ligon could sit for a total of three hours in an eight-hour workday.  R. 584-85.  No one, not even Goldman, opined that Ligon can sit for up to six hours.

I asked the government at oral argument whether there was a shred of support in the record for this six-hour finding.  The AUSA pointed to a single document: Mescon's report stating that "there are no objective findings to support the fact that [Ligon] would be restricted in his capacity to sit or stand for short periods of time."  R. 185; Tr. at 5.  But Mescon never stated how long she thought Ligon could sit.  Indeed, the AUSA explained that based on her experience of "seeing a lot of these cases, the concept of short time is two hours or less."  Tr. 6.  Thus, Mescon's conclusions at most suggest that Ligon is not restricted to sitting for two hours or less. It certainly does not follow from this conclusion alone that Ligon is therefore able to sit for six hours.

The Social Security Administration defines the ability to perform sedentary work as being "able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals. If an individual is unable to sit for a total of 6 hours in an 8-hour work day, the unskilled sedentary occupational base will be eroded."  SSR 96-9P, 1996 WL 374185, at *6.  The ALJ wrote that "claimant provides little or no medical evidence to support his claim that he is unable to sit for 6 hours in an 8-hour workday."  R. 514.  To the contrary, overwhelming evidence supports this limitation; it is the ALJ who fails to marshal a single piece of support for his claim that Ligon is capable of sitting for 6 hours out of an 8-hour workday.  The ALJ's baseless assessment of Ligon's sitting ability cannot be substituted for the uniform medical opinions in the record.  *See Newsome v. Astrue*, 817 F. Supp. 2d, 111, 133 (E.D.N.Y. 2011) (finding that the "ALJ's apparently independent assessment of the severity of the Plaintiff's injury is not a valid basis discounting the pain and disabling effects" of the Plaintiff's injury).

## CONCLUSION

The ALJ concluded that because Ligon's RFC would allow him to perform some sedentary work, there exist jobs in significant numbers in the national economy that Ligon could hold.  R. 505.  However, I conclude that the record unequivocally indicates that Ligon would be unable to sit for six hours in an eight-hour workday.  This limitation disqualifies Ligon from performing any job that exists in significant numbers in the national economy, according to Andrews's testimony.  Therefore, Ligon is disabled under the Act.  I recognize significant deference is owed to the decision of the Commissioner, but the basic premise of that standard of review is that the proceedings before the agency are fairly conducted.  *See Vargas*, 2011 WL

2946371, at *8.  Where, as here, the proceedings do not fit that description, I may not defer blindly to the ALJ's findings.

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings is denied.  Ligon's motion is granted.  The case is remanded for further proceedings limited to determining the amount of disability benefits that Ligon should receive.

So ordered.

John Gleeson, U.S.D.J.

Dated:        December 3, 2012
              Brooklyn, New York